**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**DUSTIN DUGAN, et al.,**

      **Plaintiffs,**

                                  **Case No. 2:12-CV-00811**
**v.**                                  **JUDGE GREGORY L. FROST**
                                    **Magistrate Judge Norah McCann King**

**KEVIN STARRETT, et al.,**

      **Defendants.**

<u>**OPINION & ORDER**</u>

      This matter is before the Court for consideration of Defendants Sky Wilson, Kevin Starrett, and William Barker's motions for summary judgment (ECF Nos. 60 & 61), Plaintiffs' memorandum in opposition (ECF No. 72), and Defendants' replies (ECF Nos. 76 & 77).[1]  For the reasons that follow, the Court **GRANTS** Defendant Wilson's motion for summary judgment (ECF No. 60) and **GRANTS IN PART** and **DENIES IN PART** Defendants Starrett and Barker's motion for summary judgment (ECF No. 61).  The latter motion, ECF No. 61, is **GRANTED** with respect to Defendant Barker and **DENIED** with respect to Defendant Starrett.

**I.**       **BACKGROUND**

      The question before this Court is whether law enforcement personnel used excessive force in shooting an individual, Dustin Dugan, while he was operating a reportedly stolen vehicle.  Plaintiff Kenneth Helwig was a passenger in the vehicle at or around the time of the shooting.

      At all times relevant, Defendant Kevin Starrett was a Perry County Sheriff's Deputy who had been assigned to the Perry County Drug Enforcement Task Force ("Task Force").  Defendant Sky Wilson was a New Lexington Police Officer assigned to the same Task Force.

---

[1] Defendant Village of New Lexington also moved for summary judgment but subsequently withdrew its motion. (ECF No. 76, at 7–8.)  The Court will consider ECF No. 60 as it relates to Defendant Wilson only.

Defendant William Barker was the Perry County Sheriff who allegedly failed to train and/or supervise Defendants Starrett and Wilson and who allegedly "ratified" Defendants Starrett and Wilson's use of force.  (Compl. ¶ 48.)

On February 27, 2012, the Task Force received information that Dustin Dugan was in possession of a stolen Dodge Neon, which was parked at 310 East Poplar Street.[2]  Defendant Starrett testified that he also received information that Dugan was carrying a handgun. Defendant Wilson testified that he was informed that Dugan possibly was at 310 East Poplar Street for a drug transaction.

Shortly after receiving that information, Defendants Wilson and Starrett went to the neighborhood where the Neon was parked.  Both Wilson and Starrett were wearing plain clothes and driving unmarked law enforcement vehicles.  Upon discovering that no one was home at 310 East Poplar Street, Defendants Wilson and Starrett began to conduct surveillance.  Defendant Wilson, wearing jeans and a sweatshirt with a task force badge on a lanyard around his neck, parked east of the Neon.  Wilson was driving a white van.  Defendant Starrett, wearing civilian clothes and a dark vest adorned with the word "Sheriff," parked west of the Neon.  Starrett was driving a silver GMC Envoy sport utility vehicle.

As they waited for Dugan to return to the reportedly stolen vehicle, Defendants Wilson and Starrett discussed (via radio) their plan to apprehend Dugan.  According to Starrett, the plan was to wait until Dugan returned to 310 East Poplar Street, then call for uniformed officers to arrest Dugan at the residence.  The officers also discussed how to avoid a vehicle pursuit should Dugan attempt to flee.

---

[2] An active warrant was out for Dugan's arrest at this time.

2

At this point Dugan's history with law enforcement personnel becomes relevant.  Starrett testified that he was familiar with a prior incident in which Dugan fled from officers and caused a vehicle pursuit through yards and residential neighborhoods.  On that previous occasion, an officer reached inside Dugan's vehicle and grabbed him, but Dugan continued to operate the vehicle and proceeded to drag the officer.  Dugan admitted in his deposition to fleeing law enforcement officers in the past.

Starrett testified that Dugan's history factored into the officers' plan to safely arrest him.  Specifically, the officers discussed how to avoid a vehicle pursuit.  Both Starrett and Wilson had permission from their supervisor, Defendant William Barker, to shoot Dugan's tires if the need arose.

Shortly before 6:00 pm on the day in question, Dugan returned to 310 East Poplar Street with Helwig.  Before uniformed officers arrived to make the arrest, however, Dugan and Helwig exited the residence and got in the Neon.  Dugan was driving and Helwig was in the front seat.

As the Neon pulled away from 310 East Poplar Street, heading west, Starrett pulled his GMV Envoy directly in front of the Neon.  Starrett was yelling "Sherriff's Office, stop the vehicle," but Plaintiffs did not hear his commands.  Upon seeing Starrett approaching, Dugan reversed the Neon directly into Defendant Wilson's van, which was approaching from the east.

The Neon made contact with Wilson's van.  Starrett then "pulled his vehicle closer, boxing Dugan in, but not making contact with the front of the Dodge Neon."  (ECF No. 61, at 5.)  According to Plaintiffs, the Envoy was two inches away from the front of the Envoy and "up against the front bumper of the GMC van."  (ECF No. 72, at 7.)

After Starrett and Wilson stopped their vehicles in front of and behind the Neon, both officers exited their vehicles.  Starrett approached the vehicle from the front with his gun drawn.

Starrett testified that he was yelling "Sherriff's Office, stop the vehicle" repeatedly, but Plaintiffs testified that they did not hear him.  Dugan, who remembers little from the incident, testified that Starrett yelled "stop, mother fucker."  Helwig testified that he did not hear anything and thought he and Dugan were being robbed.

At some point Helwig dove out of the car, although the parties dispute the time at which that occurred.  Starrett testified that Helwig dove out immediately and complied with Starrett's orders to get on the ground.  Helwig testified that he was in the vehicle when the shooting occurred and dove out later.

Nevertheless, it is undisputed that Dugan did not stop the vehicle and allow the officers to arrest him.  Instead, Dugan continued to rev the engine, causing the tires to spin and create smoke.  At this point the evidence becomes contradictory.

Starrett testified that, after he identified himself as an officer and yelled several times for Dugan to stop, Dugan turned the wheel towards him and pressed the gas, attempting to dislodge the Neon from between the officers' vehicles.  Starrett was in front (and to the side) of the Neon at this time.  The vehicle "began sliding from the GMC Envoy dangerously toward Deputy Starrett."  (ECF No. 61, at 5).  In fear for his safety, the safety of Helwig on the ground beside the vehicle, and possibly Wilson (who was on the other side of the vehicle), Starrett fired seven shots into the windshield of the Neon.  Dugan was struck in the arm and chest.

At that point, Starrett was able to enter the Neon and turn off the engine.  Wilson then removed Dugan from the vehicle and began to perform CPR.  Medical personnel were summoned immediately.  Uniformed officers arrived at the scene within minutes of the shooting.

It bears noting that, after the officers initially exited their vehicles, Wilson shot the front and back tires on his side of the Neon.  The parties agree that Wilson shot first.  Starrett,

4

however, testified that he did not hear Wilson's shots or any commands from Wilson before shooting through the windshield.  It is undisputed that Wilson fired only at the tires and did not strike or directly injure either Plaintiff.

Perhaps not surprisingly, Plaintiffs' recollections of the shooting differ from Starrett's. Helwig testified that Starrett exited his vehicle and almost immediately began shooting. Plaintiffs also offer the expert opinion of accident reconstructionist Frederick Licking, who opined that the Neon was effectively pinned and that the right front tire was spinning *backwards* when Starrett fired.  Licking concluded that the vehicle could not have gotten loose from the officers' vehicles in a way that would have posed a threat to Starrett.  A witness to the event echoes that conclusion: neighbor Preston Fravel testified that the Neon was completely boxed in at the time of the shooting such that it was not capable of going anywhere.

After the shooting, several facts became known.  Dugan and Helwig were unarmed. Music was playing loudly in the Neon.  And finally, the Neon belonged to Dugan's then-girlfriend's parents.  Dugan thought he had permission to use the vehicle at the time it was reported stolen.

Dugan was injured but survived the shooting.  Helwig, although he did not receive medical attention after the incident, testified that glass from the windshield struck his face. Dugan and Helwig filed the present action against Defendants Starrett, Wilson, and Barker, as well as New Lexington, Ohio, Perry County, Ohio, and the Central Ohio Drug Enforcement Task Force.  Plaintiffs assert claims of excessive force, assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress.  Starrett, Wilson, and Barker are sued in their individual and official capacities.

The parties have conducted discovery on the issue of qualified immunity.  Defendants Starrett, Wilson, and Barker now invoke the defense of qualified immunity and move for summary judgment on the constitutional claims against them in their individual capacities.  The Court now considers those motions.

## II.    ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court therefore may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B.  Qualified Immunity

"Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "  *Kirby v. Duva*, 530 F.3d 475, 481 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Courts employ a two-pronged inquiry to determine whether qualified immunity applies.  *See, e.g., Murray-Ruhl v. Passinault*, 246 F. App'x 338, 342 (6th Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)).  "First, the reviewing court must ask:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* (internal quotations omitted).  "If a constitutional right was violated, the next, sequential step is to ask whether the right was clearly established."  *Id.* at 342–43 (internal quotations omitted).  In essence, "qualified immunity is inappropriate if it would be clear to a reasonable officer that his conduct was unlawful."  *Id.* at 343.

The Sixth Circuit has made the following observation with regard to qualified immunity in excessive force claims:

> [I]f 'the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury,' the district court should not grant immunity from a deadly force claim. *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir.1989). '[S]ummary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force.' *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir.1998).

*Murray-Ruhl*, 246 F. App'x at 343.  The Court went on to note: "qualified immunity in cases involving claims of deadly force is difficult to determine on summary judgment because liability turns on the Fourth Amendment's reasonableness test."  *Id.* (citing *Sova*, 142 F.3d at 902 (internal quotations omitted)).

7

Against this backdrop, the Court will analyze each of Starrett's, Wilson's, and Barker's arguments as to why qualified immunity is appropriate.

### 1. Deputy Starrett

Defendant Starrett does not argue that the right he allegedly violated was not clearly established at the time of the shooting.  Thus, the Court's analysis of Starrett's conduct begins and ends with the first prong of the qualified immunity analysis.  The question is whether, viewing the facts in the light most favorable to Plaintiffs, Starrett's conduct violated Plaintiffs' Fourth Amendment right to be free from excessive force.

The Fourth Amendment protects individuals against *unreasonable* uses of force.  "The Fourth Amendment's reasonableness test is an objective one and 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "Accordingly, an officer accused of using deadly force in violation of a suspect's Fourth Amendment rights should not be afforded qualified immunity 'if, on an objective basis, it is obvious that no reasonably competent officer would have [shot the victim]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.' " *Id*. (quoting *Sova*, 142 F.3d at 903 (6th Cir. 1998)).

Supreme Court and Sixth Circuit precedent sets the confines of "reasonable" force.  On one side of the equation, "it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.'"  *Id*.  It is reasonable, however, for an officer to use deadly force "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id*.  "The proper application of this test requires careful attention to the facts and circumstances of each particular case, including **the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the**

**officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."** *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2006) (citing *Graham*, 490 U.S. at 396 (emphasis added)).  It is important to note that the officers need not have employed the "best" method of affecting a seizure; they need only have chosen a method that was reasonable under the circumstances.  *Davenport v. Casey*, 521 F.3d 544, 552 (6th Cir. 2008).

A comparison of two Sixth Circuit cases, *Scott v. Clay County*, 205 F.3d 867 (6th Cir. 2000) and *Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008), illustrates the limits of "reasonable" force in cases involving moving vehicles.  In *Scott*, the Sixth Circuit held that an officer acted reasonably when he shot at an intoxicated driver who had just led police on a twenty-minute high-speed chase.  205 F.3d at 871–83.  The driver ran at least one other motorist off the road and accelerated towards an officer on foot who had to dive out of the vehicle's path.  *Id*.  When the driver attempted to elude another officer on foot and return to the roadway to resume the chase, that officer was justified in shooting into the vehicle.  *Id*. at 877–78.  *See also Smith v. Freland*, 954 F.2d 343, 346–48 (6th Cir. 1992) (officer's use of deadly force was reasonable when motorist tried to escape after leading law enforcement officers in a dramatic chase).

In contrast, the Sixth Circuit declined to extend qualified immunity to a law enforcement officer in *Kirby*, finding that material questions of fact existed as to whether the officers' use of deadly force was reasonable.  530 F.3d at 482–83.  In that case, officers attempted to arrest a motorist by using two law enforcement vehicles to block the motorist's vehicle.  *Id*. at 477–79. The motorist did not obey commands to raise his hands and submit to arrest.  *Id*. at 478.  After the officers exited their vehicles and approached the motorist, he backed up and then accelerated towards one of the officers.  *Id*. at 477–79.  The motorist was shot and killed.  *Id*.  Finding that questions of fact existed as to whether the vehicle was moving in a threatening manner, whether

the officers were positioned in harm's way, whether the officers unreasonably placed themselves in harm's way, and whether the officers reasonably perceived a threat to their safety, the Sixth Circuit affirmed the district court's denial of qualified immunity at the summary judgment stage. *Id*. at 482–83. *See also Murray-Ruhl*, 246 F. App'x at 345 (no qualified immunity when a jury could conclude that the officer could not reasonably have believed that a vehicle presented a danger to him because it had already passed him when he fired); *Sigley v. City of Parma Heights*, 437 F.3d 527, 536 (6th Cir. 2006) (reversing the district court's grant of summary judgment because material questions of fact existed regarding whether an officer reasonably believed that a fleeing motor vehicle posed a threat to his safety).

Notably, similar to the facts of this case, the officers in *Kirby* highlighted the motorist's known propensity for violence. 530 F.3d at 477. The officers had received information that the motorist was a violent person who was constantly high, paranoid about law enforcement, and who constantly opened his door with a pointed gun. *Id*. The Sixth Circuit, however, found that the question was not whether the motorist's history made it likely that he was trying to harm the officers. *Id*. at 482. The question was whether the motorist was showing indifference to the officer's lives at the time of the incident, and, even if he was showing such indifference, whether the officers were actually in danger. *Id*.

Here, Starrett argues that his use of deadly force was reasonable because, taking Dugan's history fleeing law enforcement personnel into account, he faced an immediate threat to his life which necessitated the use of deadly force. But as *Kirby* shows, Dugan's history of fleeing law enforcement does not justify the use of deadly force against him. The question is whether the circumstances at the time of the shooting—i.e., whether the Neon presented an actual threat to

10

Starrett—justified the use of deadly force.  *Id.*  Those circumstances must be viewed objectively from the perspective of a reasonable officer on the scene.  *Murray-Ruhl*, 246 F. App'x at 343.

Starrett's position in this case is that the Neon moved to the right towards him, that it was capable of breaking free from the officers' vehicles, and that he had no escape route.  Starrett subjectively perceived that the Neon presented an imminent threat to him and others.  Starrett adds, "[t]here is no doubt Dugan was attempting to evade and resist arrest."  (ECF No. 61, at 13.)

Because the "reasonableness" test is objective, however, Starrett's perception of the incident is only one piece of the equation.  The other piece of the equation is Plaintiffs' version of the facts.  That version can be summarized as follows:

- The Neon was not moving to the right towards Starrett at the time of the shooting. According to accident reconstructionist Frederick Licking, the tires were actually spinning in reverse at the time Starrett fired.  Starrett's testimony is faulty on this point: he testified that the Neon was moving towards him (to the right), yet also testified that Wilson (standing to the left) was in danger.  Wilson stated in his report of the incident that he feared the "vehicle could break free and come at [him]," even though he was standing on the opposite side of the vehicle.

- Regardless of the direction the Neon's tires were moving, the Neon was trapped between the officers' vehicles and incapable of moving and posing a threat to Starrett.  Even Starrett acknowledges that he pulled the Envoy close to the Neon, "boxing Dugan in."  (ECF No. 61.)  Licking testified that, when Starrett blocked Dugan in, the Neon rode up against the Envoy's bumper, coming to rest just two inches away from the Envoy.  Licking further opined that the position of all three vehicles suggests that the Neon could not have moved and posed any threat to Starrett.  Eyewitness Preston Fravel testified that, at the time of the shooting, the Neon was "pinned" between the officers' vehicles and "wasn't going nowhere."

- Even if the Neon was moving towards him, Starrett could have gotten out of the way.  Starrett testified that he faced no obstructions along his side of the Neon and was free to position himself where he wanted.  Helwig was still in the Neon at the time of the shooting with the door closed, such that Starrett could simply move to the vehicle's side.[3]  After the shooting, Starrett was able to enter the Neon and place it in park, which suggests that he was able to easily maneuver himself around the vehicle and avoid any harm that the Neon might have posed.

---

[3] Starrett disputes this assertion and testified that Helwig was already out of the vehicle and on the ground at the time the shooting took place.

- Dugan was not knowingly resisting arrest.  Rather, Dugan did not know he was being arrested.  Defendants were wearing civilian clothes and driving unmarked vehicles.  Music was playing loudly in the Neon.  Dugan did not hear Starrett identify himself as law enforcement.  Helwig similarly did not hear Defendants identify themselves.  Preston Fravel did not hear Starrett say anything before shooting.  And although Starrett was wearing a vest that said "Sherriff," the letters were only three inches high and not visible to Plaintiffs.

Necessarily viewing those facts in the light most favorable to Plaintiffs, the Court cannot conclude that that the Neon posed an imminent threat to Starrett that would justify his use of deadly force.  Similar to the facts in *Kirby*, Plaintiffs' version of the facts could lead a jury to conclude that—regardless of Dugan's history—a reasonable officer would not have believed that the Neon posed an imminent threat to his or her safety.  Material questions of fact exist as to the location of the three vehicles, the Neon's movement in the moments leading up to the shooting, Starrett's location and ability (or lack thereof) to avoid a moving Neon, and whether Dugan knew he was being arrested.  The fact that Dugan has a history fleeing law enforcement does not necessitate a finding that Starrett's actions were objectively reasonable.

In response to Plaintiffs' argument that material questions of fact exist, Starrett argues that Frederick Licking's expert testimony is not credible and should be disregarded at the summary judgment stage.  The Court easily disposes of that argument.  Not only does it ignore the other evidence such as Fravel's and Starrett's testimony that Plaintiffs cite in support of their position, but it improperly asks the Court to weigh evidence at the summary judgment stage.  The Court is not persuaded by Starrett's arguments that Licking's opinions (which the eyewitness, Preston Fravel, appears to share) are so unreliable that they should be disregarded.

Those arguments go to the weight of Licking's testimony. That issue is one for the jury to decide.[4]

Starrett does not attempt to argue that the right he allegedly violated was not clearly established at the time of the shooting. Accordingly, under the two-pronged inquiry set forth in *Saucier v. Katz*, 533 U.S. 194, 200 (2001), qualified immunity is not appropriate. The Court **DENIES** Defendant Starrett's motion for summary judgment.

### 2. Officer Wilson

The fact that Defendant Wilson was present at the scene does not subject him to liability. Instead, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

Defendant Wilson argues that he is entitled to qualified immunity for two reasons. First, he argues that he did not violate Plaintiffs' constitutional rights by firing at the Neon's tires. Second, he argues that even if shooting the Neon's tires was unreasonable, there is no clearly established constitutional prohibition against deflating tires.

In response, Plaintiffs argue that Wilson shot first and therefore initiated the gunfire. (ECF No. 72, at 11 (citing *Floyd v. City of Detroit*, 518 F.3d 398, 401–03 (6th Cir. 2008).) But Plaintiffs' citation to *Floyd v. City of Detroit* does not aid their argument. In *Floyd*, two officers fired at an unarmed individual whom the officers intended to question. 518 F.3d at 404–06. One officer missed. *Id.* at 407. The court found that both officers had engaged in an unreasonable seizure and that, even though one officer's bullet missed its intended target, he still contributed to the unreasonable seizure by participating in the plan to run at the individual with guns drawn,

---

[4] To the extent Defendants are arguing the Court should ignore expert testimony as a matter of course at the summary judgment stage, the Court rejects that argument. Indeed, in *Kirby*, the Sixth Circuit looked to expert testimony to recreate the facts surrounding the shooting and explain the officers' position at that time. *Kirby*, 530 F.3d at 482. Licking's recreation of the facts in this case is relevant for the same reason expert testimony was relevant in *Kirby*.

restraining the individual with his errant shot, and escalating the situation in such a way as to cause the individual to be shot.  In other words, the officer's conduct in shooting at the unarmed individual (even though he missed) was itself unreasonable.

Unlike the officers in *Floyd*, Defendant Wilson acted reasonably by shooting the Neon's tires.  It is undisputed that Wilson and Starrett had authority to arrest Dugan.  It similarly is undisputed that Dugan was revving the Neon's engine, that at least one of the Neon's tires was spinning, that the tires were creating smoke as Dugan attempted to dislodge the Neon from the surrounding vehicles, and that both officers were on foot within close proximity to the Neon. Even viewing the facts in the light most favorable to Plaintiffs, the Court finds that Wilson's conduct in shooting the tires was reasonable.  Plaintiffs cite no authority to the contrary.  Indeed, Plaintiffs do not even attempt to argue that shooting the tires was unreasonable.  *Floyd*, therefore, is inapposite.

Plaintiffs similarly fail to present any evidence suggesting that Wilson's conduct impacted Starrett's.  In fact, it appears undisputed that neither Starrett nor Dugan nor Helwig was aware before Starrett fired that Wilson had shot the Neon's tires.  As such, even assuming *arguendo* that Wilson could be liable for Dugan's injuries if he caused Starrett to fire, Plaintiffs presented no evidence to suggest that any such causal connection exists.

Finding no questions of material fact as to whether Defendant Wilson committed a constitutional violation, the Court finds that Defendant Wilson is entitled to qualified immunity. The Court therefore **GRANTS** Wilson's motion for summary judgment.

    *3.  Defendant Barker*

Defendant Barker moves for summary judgment on the claims against him in his individual capacity.  Barker argues that he was not personally involved in the shooting and therefore cannot be individually liable.

The Court agrees.  Plaintiffs' only response to Defendant Barker's motion is that Barker is "liable under theories of failure to train and supervise."  (ECF No. 72, at 18.)[5]  Plaintiffs effectively concede that Barker was not personally involved in Starrett's alleged excessive force.  Because individual liability must be based on "active unconstitutional behavior, as opposed to a mere failure to act," *Ontha v. Rutherford*, 222 F. App'x 498, 504 (2007) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)), Plaintiffs fail to meet their burden in demonstrating that Barker is subject to individual liability in this case.  The Court therefore **GRANTS** Defendant Barker's motion for summary judgment.

### C.  Plaintiff Helwig's Claims

As a final matter, the Court addresses Defendants Starrett and Barker's cursory suggestion in their motion that Helwig's Fourth Amendment claim should be dismissed since "no force was used to effectuate Helwig's arrest."  (ECF No. 61, at 14.)  Contrary to Defendants' one-sided presentation of the evidence, Helwig testified that he was in the Neon when the shooting occurred and that glass from the windshield struck and cut his face.  Helwig later dove out of the vehicle and was arrested.  Defendants do not address this testimony in their motion.  Their argument that Helwig's claim is based entirely on the force used against Dugan is not well taken.

---

[5] Plaintiffs also assert that summary judgment should be denied because Barker did not answer questions in his deposition about his prior contact with Dugan.  (ECF No. 72, at 18.)  It is unclear how any such prior contact could subject Barker to liability for actively participating in Starrett's alleged use of force.

**III.     CONCLUSION**

For the foregoing reasons, the Court finds that summary judgment is appropriate on Plaintiffs' constitutional claim (Count One) against Defendants Wilson and Barker in their individual capacities. There remains a genuine issue of material fact, however, as to Plaintiffs' constitutional claim against Defendant Starrett in his individual capacity.  The Court therefore **GRANTS** Defendant Wilson's motion for summary judgment (ECF No. 60), and **GRANTS IN PART** and **DENIES IN PART** Defendants Starrett and Barker's motion for summary judgment (ECF No. 61).  The latter motion, ECF No. 61, is **GRANTED** with respect to Defendant Barker and **DENIED** with respect to Defendant Starrett.

**IT IS SO ORDERED.**

**/s/ Gregory L. Frost**_____
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**